U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 FEB 24 PM 2:04

CLERK

BY_____ LAW

DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA      )
                              )
          v.                  )      Case No. 2:25-cr-00039-cr-1
                              )
ALASSANE SOW,                 )
          Defendant.          )

**OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO DISMISS**
(Doc. 22)

On April 17, 2025, Alassane Sow was charged in a one-count indictment with illegal reentry in violation of 8 U.S.C. § 1326(a). On November 10, 2025, Mr. Sow moved to dismiss the Indictment. (Doc. 22.) On December 8, 2025, the government opposed the motion, (Doc. 31), and on January 9, 2026, Mr. Sow filed a reply. (Doc. 39.) The court heard oral arguments on January 29, 2026 (the "January 29, 2026 Hearing"), and thereafter took the motion to dismiss under advisement.

Mr. Sow is represented by Assistant Federal Public Defenders Emily Kenyon and Sara M. Puls. The government is represented by Assistant United States Attorney Nathanael R. Burris.

**I.      Factual and Procedural Background.**

Mr. Sow was admitted to the United States on March 20, 2014 as a Legal Permanent Resident ("LPR"). He is a citizen of Senegal, and his parents and children are United States citizens. Mr. Sow resided with his parents and children in Ohio until he was removed from the United States on October 16, 2024.

In June 2016, Mr. Sow pled guilty to charges of attempted vehicular assault and failure to stop after an accident in Ohio. As a result, he was sentenced to three years of "community control" and served ninety days in jail. (Doc. 31 at 2.) "In March 2019, [Mr.] Sow violated his probation in a number of ways: (1) he was convicted of driving under suspension, (2) he was charged with theft and forgery, (3) he failed to report for

three urinalysis tests and had three positive tests for marijuana, one of which was diluted, and (4) he failed to verify his employment." *Id.* That same year, in September 2019, Mr. Sow pled guilty to three counts of theft in Ohio. The following month, in October 2019, Mr. Sow was convicted of receiving stolen property in Ohio and "was ultimately sentenced to a total of four-and-a-half years of imprisonment." *Id.* at 3.

Due to his criminal convictions, Mr. Sow's LPR status was revoked. On February 28, 2023, Mr. Sow was issued a Notice to Appear ("NTA") while in custody. Upon conclusion of his criminal sentence in May 2024, Mr. Sow was transferred to immigration custody. On June 12, 2024, Mr. Sow was incarcerated at the Seneca County Jail ("SCJ"). On that same date, Mr. Sow was placed in lockdown at SCJ for "[a]ttempting to control the behavior of other inmates" through "coercion, force of threat, [or] force of physical harm." (Doc. 22-8 at 3) (internal quotation marks omitted). Shortly thereafter, on June 21, 2024, Mr. Sow sent a message to his sister, Aminata Lee, stating, "[t]ell Alissa to send you any information the lawyers have and researched for that I already paid for or hit up the lawyer['s] office directly and tell them [yo]u need all the file[s] . . . and proof that they did some [re]search on my behalf from [the] court[.]" (Doc. 31-1 at 2.) Sometime during the following month, July 2024, Mr. Sow "request[ed] to move to another pod at [SCJ]" and "threaten[ed] to start a hunger strike[.]" (Doc. 22-8 at 3.) Mr. Sow stopped eating and "complain[ed] that he doesn't want to be in the block he's in" and that he "wants his veneers fixed." *Id.*

On July 16, 2024, the Immigration Judge ("IJ") offered Mr. Sow the opportunity to voluntarily depart from the United States in lieu of removal. Five days later, on July 21, 2024, Mr. Sow sent a message to his sister stating that his immigration proceedings "[continue] for another 2[]weeks to get a lawyer and [the IJ] . . . offered me vol[u]ntary departure[,] but [I] didn[']t take [it] [be]cause my situation in Senegal [with] death threats but thinking about [going] to another country [I don't know] yet[.]" (Doc. 31-1 at 4.) The following day, on July 22, 2024, Mr. Sow sent another message to his sister, wherein he seemingly referred to Attorney Cat Miller: "I called her and she seems very nice and she

2

told me to call back [F]riday to see . . . if she can represent me[. S]he said she only take[s] on cases if she can help so we will see[.]" *Id.* at 5.

On July 30, 2024, the IJ held a hearing (the "July 30, 2024 Hearing"), during which Mr. Sow accepted the IJ's offer for voluntary departure. At the July 30, 2024 Hearing, the IJ informed Mr. Sow: "You have the right to be represented by an attorney or qualified representative of your own choosing at no expense to the government. You should have received a copy of our free legal services list. If you haven't, the [c]ourt will make sure that you get a copy." (Doc. 22-5 at 3:25-4:8.) Mr. Sow represented himself at the July 30, 2024 Hearing, and the following discussion transpired concerning his desire to obtain legal counsel and his voluntary departure:

> MR. SOW: . . . So I talked to my family . . . trying to persuade [them of voluntary departure]. Like . . . let them know . . . this is the best option I can get, because, you know, getting deported is so much humiliation. And so I talked to them . . . [about] me [] get[ting] granted [] voluntary departure so I can buy my ticket and leave on my own.
>
> THE COURT: Okay.
>
> MR. SOW: And hopefully . . . in, like, three years I can [return to the United States] – like my family, . . . my sponsor and stuff, . . . everybody willing to do the research. Because we talked to . . . Attorney Cat Miller.
>
> THE COURT: Okay.
>
> MR. SOW: Who was going to represent me today, but I told her it's not necessary. I'm [] just going to take [voluntary departure] and then buy my ticket. We . . . already decide[d] a process to it.
>
> THE COURT: Okay.
>
> MR. SOW: And also, . . . I [have] a cosmetic porcelain veneer on my teeth. And while I was incarcerated, it broke down. And you told me that . . . the government will not fix it. And my . . . sister who . . . works for ICE, actually, [] me and her, we said we [would] start [the] process of asking for [a] visa to . . . Turkey, where I can go for [my] layover on my ticket for seventeen hours and fix my veneer. So I can go, you know, . . . be presentable to people . . . when I get to Senegal. So I was asking [] the [c]ourt[,] . . . can [I] . . . buy m[y] ticket [so] that [I] can have a layover where I can get granted a visa in Turkey to fix my veneer so I can leave . . . the [United States] and hopefully come back and take care of my family and my children.

***

MR. LUNSFORD: I would just ask the [c]ourt to make sure [Mr. Sow]'s clear. I think he seems to be under the impression that he might be leaving custody and traveling[.]

THE COURT: I'll explain that all to him.

***

THE COURT: Okay. So I'm going to grant your request for voluntary departure, Mr. Sow. But let me . . . explain a few things to you.

MR. SOW: Um-hum.

THE COURT: . . . [S]o in order for you to get voluntary departure, the first thing you're going to have to do is withdraw your application for asylum, okay?

MR. SOW: Okay. Okay.

THE COURT: And this is a final resolution to your case. So there's no appeal. So you're . . . accepting this as a final resolution.

MR. SOW: Okay.

THE COURT: You will not be ordered removed. So . . . I'm granting you voluntary departure. Now, I'm going to give you a date by which to depart. . . . [T]he departure date is going to be August 28, 2024. So it's up to you to arrange your transportation with your deportation officer. They come to the [SCJ] and he would talk to you about it. If you want to leave earlier you can. You could leave all the way up to August 28, 2024. So I'm giving you thirty days to leave.

MR. SOW: Okay.

THE COURT: Now, that time could be extended, if it's necessary, all the way up to 120 days. But I'm assuming you want to leave as soon as possible so you're longer –

MR. SOW: Yup.

THE COURT: – [I]ncarcerated, am I correct?

MR. SOW: Yes, Your Honor.

THE COURT: Okay. **So you have to have a travel document.** You have to pay for your own ticket.

MR. SOW: Okay.

THE COURT: Now what's going to happen is you're not going to be released. When . . . it's time to leave, you're going to be taken by one of the officers to your port of departure, and you're going to fly off.

4

now.'" *Fernandez-Antonia*, 278 F.3d at 159 (citation omitted). "[T]he appropriate test for prejudice is the one used to decide ineffective assistance of counsel claims, namely, prejudice is shown where 'there is a reasonable probability that, but for [the IJ]'s unprofessional errors, the result of the proceeding would have been different[.]'" *Copeland*, 376 F.3d at 73 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

Even if there were a fundamental procedural error in his case, Mr. Sow has not demonstrated prejudice. He has not established that, had the IJ provided a more fulsome explanation of the procedures governing voluntary departure, he would have voluntarily departed the United States by August 29, 2024, would have refused voluntary departure, or would have exercised other rights. It is clear from his tenure at SCJ that Mr. Sow had no difficulty in advocating for his own interests, and it is undisputed that his sister worked for ICE. In his undated letter to the IJ, Mr. Sow does not mention his inability to obtain his passport, rather he complains that ICE did not tell him where to have his luggage and travel document dropped off. In the removal process, Mr. Sow instructed his sister to bring his luggage to SCJ. There is no indication that he could not have done the same when attempting to voluntarily depart. In the undated letter to the IJ, Mr. Sow admits that ICE has been in regular contact with him. At best, his letter to the IJ expresses confusion regarding how the voluntary departure would take place.

Although Mr. Sow's acceptance of voluntary departure negated his asylum application, he does not establish that his asylum application would have been granted or would have even been deemed possibly meritorious. Under 8 U.S.C. § 1158, a noncitizen who has "been convicted by a final judgment of a particularly serious crime," including "an aggravated felony," is ineligible for asylum. 8 U.S.C. § 1158(b)(2)(A)(ii), (b)(2)(B)(i). The INA defines "aggravated felony" as, among other things, "a theft offense (including receipt of stolen property) . . . for which the term of imprisonment at least one year[.]" *Id.* at § 1101(43)(G) (internal quotation marks omitted). Mr. Sow was convicted of three counts of a theft and one count of receiving stolen property and received a four-and-a-half-year sentence as a result. Accordingly, he has not and cannot establish prejudice associated with foregoing a meritorious asylum application.

MR. SOW: Okay.

THE COURT: You . . . understand what I'm saying?

MR. SOW: Yeah. I understand. I want to ask this question. Right?

THE COURT: Yes.

MR. SOW: Is the fly off – is it – they just – the officer just make[s] sure I leave [the] United States?

THE COURT: Yes. Correct.

MR. SOW: Or they got to make sure I get – okay.

THE COURT: No.

***

THE COURT: They're not going to travel with you to Senegal. Normally, they don't. . . . . I would find it unusual if they traveled with you. They can, but . . . it's been a long time since I've seen something like that happen. So they will take you to the airport and you will fly out. Okay? Now, if you could arrange going to Turkey, that's fine. You have to do that on your own.

MR. SOW: Okay.

THE COURT: I mean, you have to leave the country by August 28, 2024. Now, if you don't leave, the [c]ourt orders a removal order against you automatically. So you've got to leave.[1]

MR. SOW: Okay.

THE COURT: So if you don't – if you . . . decide you're not going and you refuse to leave, then [I will] order you removed. You understand what I'm saying?

MR. SOW: Okay.

***

THE COURT: So you've got to leave –

MR. SOW: Okay.

THE COURT: – by that day. The other thing is you will be subject to a civil penalty if you don't leave of . . . not less than 1,000 or more than 5,000 dollars. Now, in your case, I'm going to set the presumptive amount of 3,000 dollars. So, if you don't leave, if August 28th rolls around and you refuse to leave, not only am I going to order you removed from the United

---

[1] The transcript erroneously indicates these statements were made by Mr. Sow.

5

States automatically, but you're also going to owe the Government 3,000 dollars for failing to leave. Understood?

MR. SOW: Okay.

THE COURT: **Now, you [have] to cooperate with the government immigration officials and you know, supply the ticket and your travel document.**

MR. SOW: Okay.

THE COURT: If you change your mind, and that would be by filing a motion to reopen or reconsider, during the voluntary departure period, there still will be a voluntary departure – strike that. The voluntary departure will automatically be terminated, and an alternate order of removal will take effect immediately, but you won't owe the civil penalty of 3,000 dollars. Do you understand?

MR. SOW: Yeah, I understand. I just want to make this clear, and it's on record. So basically, you granted me a voluntary departure where I can buy . . . a designated ticket[,] where I can have a layover in Turkey and fix my teeth and then go to Senegal?

THE COURT: I can't promise you that. You just have to leave by the 28th. I'm not promising that you'll have a layover.

MR. SOW: Okay.

THE COURT: You [have] to work that out on your own.

MR. SOW: Okay. No, I'm saying, like my ticket, like I can . . . buy some ticket that's designed like that. That's what I'm saying.

THE COURT: I don't care how you travel back. It doesn't matter to me.

MR. SOW: Okay.

THE COURT: Okay?

MR. SOW: All right. Thank you. Thank you, Your Honor.

THE COURT: I just can't guarantee you that you'll be able to go to Turkey. You [have] to work that out. I can't work that out. You understand what I'm saying?

Mr. SOW: Okay. Thank you. Yep.

THE COURT: Okay. So you want voluntary departure, am [I] correct?

MR. SOW: Yes. . . .

***

THE COURT: So I'm going to mark that you're withdrawing your I-589 application, your asylum application.

MR. SOW: Um-hum.

*** 

THE CLERK: It's auto-populated August 29th, in [this] case.

THE COURT: Okay, August 29th is fine. So its August 29th, not 28th. . . .

MR SOW: Okay. So I buy my ticket – however I buy my ticket, that's on me.

THE COURT: That's on you.

MR. SOW: Your only concern is [that] I leave this country by August 29th?

THE COURT: That's the only . . . thing [] I care about. Okay?

MR. SOW: Okay. Thank you, Your Honor. . . .

(Doc. 22-5 at 9:18-18:4) (emphasis supplied).

The same day, on July 30, 2024, the IJ entered an Order (the "Voluntary Departure Order"), granting Mr. Sow "pre-conclusion voluntary departure under Immigration and Nationality Act (INA) § 240B(a), in lieu of removal, without expense to the [g]overment, on or before [August 29, 2024], or any extensions as may be granted by the Department of Homeland Security (DHS), and under any other conditions DHS may direct." (Doc. 22-4 at 1.) Although the box next to it was unchecked, the Voluntary Departure Order stated, "[i]t is FURTHER ORDERED: . . . **that [Mr. Sow] provide DHS with [his] passport or other travel documentation sufficient to assure lawful entry into the country to which [he] is departing within [sixty] days of this order, or within any time extensions that DHS may grant[.]**" *Id.* (emphasis supplied).

The Voluntary Departure Order explained "that if any of the above-ordered conditions are not met as required or if [Mr. Sow] fails to depart as required, the above grant of pre-conclusion voluntary departure shall be withdrawn without further notice or proceedings and the following order, entered pursuant to 8 C.F.R. § 1240.26(d), shall become immediately effective[.]" *Id.* The Order advised that, if Mr. Sow "files a motion to reopen or reconsider during the voluntary departure period, . . . the grant of voluntary

7

departure will be terminated automatically, [and] the alternate order of removal will take effect immediately[.]" *Id.* at 2.

Within a week, on August 6, 2024, an ICE officer made the following note in Mr. Sow's case file:

> The Consulate of Senegal inquired about the case of [Mr.] Sow . . . a Senegalese noncitizen detained at [SCJ]. This noncitizen was granted voluntary departure . . . by an [IJ] on July 30, 2024. I provided the consulate with a copy of the [Voluntary Departure Order], informed them that his family can provide a plane ticket for his departure, and sent them the link to the public ICE webpage with information on [SCJ]."

(Doc. 22-8 at 3.) The ICE officer noted that he or she received Mr. Sow's file without a passport and indicated that the "[j]ail liaison [would] speak with [Mr. Sow] and ask if he has one." *Id.*

The same day, on August 6, 2024, Mr. Sow sent the following message to his sister:

> [ICE officers] just asked me who[']s buying my ticket **and if [I have] a passport[, and I] said yes.** I gave them [yo]ur number[. O]fficer Noll [is going to] call [yo]u [for] correspond[e]nce [and] [] buying [my] ticket so please call [I]brahima or Amadou [] or go to [New York City] to pick it up[.]

(Doc. 31-1 at 6) (emphasis supplied).

Two days later, on August 8, 2024, his sister responded:

> There's a ticket direct to Dakar on Monday. Ask the [ICE] officer if there will be someone to escort you and handcuff you until you board the flight. If not, I can book you on the flight from [John Glenn Columbus International Airport] to [John F. Kennedy International Airport] then [to Blaise Diagne International Airport] so we can see you and bring you your stuff[] at the airport since you can check 2 bags. The ticket is around $1[,]500[.]

*Id.* at 7.

"Sometime before August 12, 2024, Mr. Sow bought a ticket to depart from Ohio to Senegal on August 19, 2024." (Doc. 22 at 6) (citation omitted). On August 20, 2024, an ICE officer entered the following note in Mr. Sow's file:

Received message from [SCJ] liaison on 8/12 that [Mr. Sow] purchased a ticket for 8/19. It was reiterated that he cannot purchase a ticket on his own, the process needs to be done through [detention] travel [management] and that a [passport] has yet to be received. Sent follow up email [on] 8/20 requesting update on [passport].

(Doc. 22-8 at 3.) The ICE officer wrote that he "[s]ent [an] email to Senegal [Detention and Deportation Office] requesting [an] update on [Mr. Sow]'s claim that the consulate was issuing a [travel document]." *Id.*

The following day, on August 21, 2024, an ICE officer wrote:

Received response from [Senegal Detention and Deportation Office] . . . regarding [Mr. Sow]'s [travel document] – consulate was notified of [Mr. Sow]'s [voluntary departure]. [Mr. Sow] claims he has made contact with the consulate and they are supposedly waiting for [Enforcement and Removal Operations] to contact them[,] but[] they have not received any info[rmation] regarding [the travel document] request.

*Id.*

The next day, on August 22, 2024, an ICE officer noted: "[Voluntary departure] has been sent to Senegal consulate. They have been notified that a [travel document request] will be submitted once [Mr. Sow] hits final order, August 29." *Id.* at 2. A day later, on August 23, 2024, Mr. Sow was "placed in [] lockdown status at [SCJ] after allegedly assaulting another detainee[.]" *Id.*

In his amended affidavit, Mr. Sow asserts the following:

[] My mother had my valid Senegalese passport during this time.[2] She was in Ohio.

[] To the best of my recollection, I met with the ICE employee at [SCJ] on the Tuesday following my July 30, 2024 [H]earing.

[] I told the ICE employe[e] that I would purchase my ticket. I told him that my family had my passport and my luggage. I gave him the phone number of my sister, Aminata Lee. He told me that he would have another ICE employee, who is my officer, call my family to coordinate the delivery of the passport or tell them where to drop it off.

[] I purchased a ticket to fly from Ohio to Senegal on August 19, 2024.

---

[2] Mr. Sow's initial affidavit asserted that his passport was in his sister's possession during this time.

[] I told the ICE employee that I purchased this ticket. He told me that he had talked to another ICE employee and that I was not allowed to buy my ticket and instead had to coordinate it with ICE. I told him that [the IJ] told me that I could purchase my own ticket.

[] I asked him for the phone number or name of my ICE officer so that I could give [it] to my family to coordinate the drop off of my passport. He said that he could not give it to me. He said he would ask my ICE officer to call my family.

[] I met with [the ICE employee] every time that I knew he was at [SCJ]. He repeatedly told me that he would talk to my ICE officer and have them call my family.

[] He told me several times that he forgot to tell the ICE officer to call my family.

[] No one from ICE ever contacted my family to tell them where they could deliver [my] passport.

[] I did not know where [my] passport needed to be delivered.

[] I did no[t] know what to do. I wanted to voluntarily depart the country.

[] I wrote to [the IJ] for help.

(Defendants Exhibit F-1 at 1-2.)

At some point after July 30, 2024, Mr. Sow wrote an undated letter to the IJ, stating:

Since that day on July 30, 2024[,] when you granted me voluntary departure[,] I [have] been in contact with the ICE officer who [has] been coming to [SCJ] weekly[. A]t first he asked [for] the contact of [a] family member taking [illegible] my stuff and I gave him my sister['s] number [illegible] my sister have been waiting for [illegible] in vain. I [went] ahead and [bought] my ticket for $1645 no[n-]refundable, at first for August 19, 2024 then because of weather in NYC my ticket was [illegible] to [] August 21[,] 2024[.] [illegible] waiting for ICE to tell [my family] where to go and drop off my luggage and travel document but never heard from them[.] [E]very time the officer [illegible] g[a]ve me different version of why my officer didn't reach out. I did what I was told which [wa]s to buy my ticket and provide paperwork[.]

(Doc. 22-10 at 1.)

Mr. Sow did not leave the United States on or before August 29, 2024, and, as a result, his Voluntary Departure Order automatically converted into a removal order.

Thereafter, on September 3, 2024, ICE officers sent a travel document request for Mr. Sow to the Senegal consulate, which was issued on September 5, 2024. A few days before being removed, on October 11, 2024, Mr. Sow sent a message to his sister, asking her to "bring my luggage [to] where [I] am" and providing the address for the SCJ. (Doc. 31-1 at 8.)

On October 16, 2024, Mr. Sow was removed from the United States. Approximately six months later, on April 13, 2025, a remote camera positioned near the border of the United States and Canada in Holland, Vermont, allegedly captured Mr. Sow walking through the woods at 12:58 a.m. United States Border Patrol agents subsequently found and arrested Mr. Sow, and he was charged with one count of illegal reentry in violation of 8 U.S.C. § 1326(a).

## II.    Conclusions of Law and Analysis.

Mr. Sow contends that, as a result of erroneous or incomplete information provided by the IJ at the July 30, 2024 Hearing, his voluntary departure was thwarted, thereby requiring dismissal of his illegal reentry charge. The government counters that Mr. Sow has not established the necessary elements to invalidate his underlying removal order.

### A.    Standard of Review.

A noncitizen can be granted voluntary departure in lieu of removal proceedings pursuant to 8 U.S.C. § 1229c, also referred to as Immigration and Nationality Act ("INA") § 240B(d). Voluntary departure requires that a noncitizen depart the United States at his or her "own expense[.]" 8 U.S.C. § 1229c(a)(1). A noncitizen "may be granted voluntary departure . . . only if" he or she:

(A) Makes such request prior to or at the master calendar hearing at which the case is initially calendared for a merits hearing;

(B) Makes no additional requests for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section);

(C) Concedes removability;

(D) Waives appeal of all issues; and

(E) Has not been convicted of a crime described in section 101(a)(43) of the [INA] and is not deportable under section 237(a)(4).

8 C.F.R. § 1240.26(b)(1)(i)(A)-(E).

The following procedure governs voluntary departure:

The judge may impose such conditions as he or she deems necessary to ensure the alien's timely departure from the United States, including the posting of a voluntary departure bond to be canceled upon proof that the alien has departed the United States within the time specified. *The alien shall be required to present to DHS, for inspection and photocopying, the alien's passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing*, unless:

(A) A travel document is not necessary to return to the alien's native country or to which country the alien is departing; or

(B) The document is already in the possession of DHS.

*Id.* § 1240.26(b)(3)(i) (emphasis supplied).

"Upon granting a request made for voluntary departure . . . , the [IJ] shall also enter an alternate order o[f] removal." *Id.* § 1240.26(d). If a noncitizen fails to voluntarily depart by the specified date, "the voluntary departure order shall vacate automatically[,] and the alternate order of removal will take effect[.]" *Id.* § 1240.26(b)(3)(ii). A noncitizen who fails to voluntarily depart "(A) shall be subject to a civil penalty of not less than $1,000 and not more than $5,000; and (B) shall be ineligible, for a period of 10 years, to receive any further relief under this section and sections 1229b, 1255, 1258, and 1259 of this title." 8 U.S.C. § 1229c(d)(1)(A)-(B).

8 U.S.C. § 1326(a) generally prohibits noncitizens who were previously "denied admission, excluded, deported, or removed" from reentering the United States without permission to reapply for admission. 8 U.S.C. § 1326(a)(1). Because removal is an element of illegal reentry pursuant to 8 U.S.C. § 1326(a), a noncitizen "can defend against such a charge by challenging the validity of the deportation order upon which the charge is predicated." *United States v. Copeland*, 376 F.3d 61, 66 (2d Cir. 2004).

Under 8 U.S.C. § 1326(d), a noncitizen bears the burden of establishing the following three elements in order to invalidate an underlying removal order: "(1) the alien exhausted any administrative remedies that may have been available to seek relief

12

against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d)(1)-(3). "[E]ach of the statutory requirements of § 1326(d) is mandatory." *United States v. Palomar-Santiago*, 593 U.S. 321, 329 (2021). "The purpose of collateral review in a § 1326 prosecution is to afford an alien the opportunity to have some judicial review of his deportation proceeding." *United States v. Fernandez-Antonia*, 278 F.3d 150, 159 (2d Cir. 2002) (citation omitted).

## B.    Whether Mr. Sow Exhausted His Administrative Remedies.

Mr. Sow argues that "there were no administrative remedies available[,]" and alternatively, even if administrative remedies were available, "[his] failure to exhaust administrative remedies must be excused because his 'failure to exhaust resulted from an invalid waiver of the right to an administrative appeal.'" (Doc. 22 at 16-17) (alteration adopted) (citation omitted).

### 1.    Whether Administrative Remedies Were Available.

As a threshold issue, Mr. Sow claims that there were no administrative remedies available to him because the IJ "informed [Mr. Sow] if he was granted voluntary departure that it would be a 'final resolution' and 'there's no appeal[,]'" and the IJ did not explain that any request to extend the voluntary departure period "would have to be made to DHS." (Doc. 22 at 16-17) (alteration adopted). Although Mr. Sow waived the right to appeal the IJ's decision to the Board of Immigration Appeals ("BIA"), the IJ advised him that he could request an extension of his voluntary departure deadline. During the July 30, 2024 Hearing, the IJ did not explain that such requests must be directed to DHS, but the Voluntary Departure Order makes this clear. *See* Doc. 22-4 at 1 (explaining that Mr. Sow must depart on or before August 29, 2024 "or [within] any extensions as may be granted by [DHS.]"). Mr. Sow neither sought an extension, nor does his colloquy with the IJ reflect an intent to request an extension. Instead, Mr. Sow confirmed that, because he was incarcerated, he intended to leave the United States as soon as possible.

Mr. Sow could have filed a motion to reopen or reconsider, which the IJ explained to him during the July 30, 2024 Hearing and through the Voluntary Departure Order.

13

However, Mr. Sow likewise did not file a motion to reopen or reconsider. *Compare Barrera-Vasquez v. United States*, 2011 WL 335168, at *4 (S.D.N.Y. Feb. 1, 2011) ("[Noncitizen]'s failure to file a motion to reopen his removal proceeding, and thus exhaust his administrative remedies, ensures that his claims cannot survive collateral review."), *and United States v. Garcia*, 2008 WL 3890167, at *13 (E.D.N.Y. Aug. 19, 2008) (finding noncitizen did not exhaust his administrative remedies because he "did not subsequently move to reopen his case[]"), *with Copeland*, 376 F.3d at 67 ("[Noncitizen]'s motion to reopen his deportation hearing and his appeal from the denial of that motion satisfied the exhaustion requirement of Section 1326(d)[(1)].").

Mr. Sow contends that "[a]ny request to extend the time to voluntarily depart would have [] been futile given that the ICE officials involved in Mr. Sow's case appeared unwillingly to help him procure his passport[]" and "filing a motion to reopen or reconsider would have been futile because it would have prevented Mr. Sow from obtaining the precise relief he was seeking, the opportunity to voluntarily depart." (Doc. 39 at 4.) The Second Circuit has held "that there is no futility exception, with one qualification . . . , to statutory exhaustion requirements." *Copeland*, 376 F.3d at 66 (citations omitted). "The qualification . . . is that futility excuses a litigant from a statutory exhaustion requirement 'where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint.'" *Id.* at 67 (quoting *Booth v. Churner*, 532 U.S. 731, 736 (2001)). The narrow futility qualification does not apply here. Had Mr. Sow requested a voluntary departure extension from DHS, it had authority to take action in response. Had Mr. Sow filed a motion to reopen or reconsider, the IJ could have decided those motions. *See United States v. Calderon*, 391 F.3d 370, 374 (2d Cir. 2004) (finding noncitizen failed to exhaust available administrative remedies because "he did not subsequently move to reopen his case, and he is not subject to . . . the futility exception[]"). Mr. Sow does not contend otherwise but instead attempts to construe the qualified futility exception beyond its limited application.

14

Administrative remedies were available to Mr. Sow, and he failed to exhaust them. The only issue is whether his failure may be excused.

### 2. Whether Mr. Sow's Failure to Exhaust Administrative Remedies May Be Excused.

#### a. Whether *United States v. Sosa* Has Been Overruled.

Mr. Sow contends that his failure to exhaust available administrative remedies may be excused under *United States v. Sosa*, 387 F.3d 131 (2d Cir. 2004) and its progeny. In *Sosa*, the Second Circuit held that "[a] failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1) . . . only where an alien's waiver of administrative review was knowing and intelligent." *Id.* at 136. "[T]he exhaustion requirement must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal." *Id.* The Second Circuit reasoned that, without this opportunity, § 1326(d) would violate *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987) "by prohibiting collateral attacks of deportation proceedings that were fundamentally unfair because they denied the alien an opportunity for judicial review." *Sosa*, 387 F.3d at 136.

The Second Circuit has excused a noncitizen's failure to exhaust administrative remedies under § 1326(d)(1) when his or her waiver of the right to administrative appeal was not knowing and intelligent. *See Calderon*, 391 F.3d at 375 ("[A]s the [d]istrict [c]ourt's finding that [noncitizen]'s waiver was not knowing and intelligent does not constitute clear error, we conclude that the failure to exhaust administrative remedies therefore does not bar collateral review of the deportation proceeding."); *see also United States v. Gomez-Hernandez*, 777 F. Supp. 2d 464, 470 (E.D.N.Y. 2011) ("[T]he [c]ourt concludes that, consistent with *Sosa*, [noncitizen]'s waiver of his right to appeal was not knowing and intelligent. Therefore, [noncitizen]'s failure to exhaust administrative remedies is excused for purposes of Section 1326(d).").

The government argues that the Supreme Court's recent decision in *Palomar-Santiago*, 593 U.S. 321 abrogated *Sosa*. In *Palomar-Santiago*, the Supreme Court granted certiorari on the following basis:

15

[The Ninth Circuit and district courts thereunder] were bound by Ninth Circuit precedent providing that defendants are "excused from proving the first two requirements" of § 1326(d) if they were "not convicted of an offense that made them removable." Other Courts of Appeals do not excuse similarly situated unlawful-reentry defendants from meeting § 1326(d)'s first two requirements. This Court granted certiorari to resolve this disagreement.

*Id.* at 326 (footnote and internal citation omitted). The Supreme Court subsequently held

"that each of the statutory requirements of § 1326(d) is mandatory." *Id.* at 329. In so

ruling, the Supreme Court reasoned:

The Ninth Circuit's interpretation is incompatible with the text of § 1326(d). That section provides that defendants charged with unlawful reentry "may not" challenge their underlying removal orders "unless" they "demonstrate" that three conditions are met: (1) they have "exhausted any administrative remedies," (2) they were "deprived . . . of the opportunity for judicial review," and (3) "the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d). The requirements are connected by the conjunctive "and," meaning defendants must meet all three. When Congress uses "mandatory language" in an administrative exhaustion provision, "a court may not excuse a failure to exhaust." *Ross v. Blake*, 578 U. S. 632, 639 . . . (2016). Yet that is what the Ninth Circuit's rule does.

*Id.* at 326 (alteration adopted).

Mr. Sow argues that *Sosa* has not been abrogated by *Palomar-Santiago* because

the Supreme Court "addressed a very specific rule that is not applicable to this case[]"

under which noncitizens would be excused "from proving the first two requirements of §

1326(d) if they were not convicted of an offense that made them removable." (Doc. 39 at

3) (alteration adopted) (internal quotation marks omitted) (quoting *Palomar-Santiago*,

593 U.S. at 326).

Courts in the Second Circuit must follow binding Second Circuit precedent

"unless and until it is 'overruled either by an en banc panel of [the Second Circuit] or by

the Supreme Court.'" *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 100

(2d Cir. 2024) (citation omitted). Precedent can be overruled expressly or implicitly. *See*

*In re S. Afr. Apartheid Litig.*, 15 F. Supp. 3d 454, 459-60 (S.D.N.Y. 2014) ("Courts have

interpreted this to mean that a decision of the Second Circuit is binding unless it has been

16

called into question by an intervening Supreme Court decision or by one of the Second
Circuit sitting *in banc* or unless and until its rationale is overruled, implicitly or
expressly, by the Supreme Court, or the Second Circuit court *in banc*.") (emphasis in
original) (alteration adopted) (footnote and internal quotation marks omitted). In other
words, district courts are "required to follow [a precedential Second Circuit] decision
unless and until it is overruled in a precedential opinion by the Second Circuit itself or
unless a subsequent decision of the Supreme Court so undermines it that it will almost
inevitably be overruled by the Second Circuit." *United States v. Diaz*, 122 F. Supp. 3d
165, 179 (S.D.N.Y. 2015) (internal quotation marks and citations omitted), *aff'd,* 854
F.3d 197 (2d Cir. 2017).

There is indisputably tension between *Palomar-Santiago* and *Sosa*, but this does
not necessarily mean that *Sosa* is overruled. *See Monsanto v. United States*, 348 F.3d
345, 351 (2d Cir. 2003) (noting there was tension between a Second Circuit case and
Supreme Court case and finding "[d]espite this tension, we—like the district court—are
required to follow [Second Circuit precedent], as that case constitutes a binding precedent
of our court[]"); *United States v. Diaz*, 122 F. Supp. 3d 165, 180-81 (S.D.N.Y. 2015)
("[W]hile [the Supreme Court case] is indisputably in tension with [the Second Circuit
case], the Court cannot unequivocally find that the Supreme Court or the Second Circuit
would overrule [the Second Circuit case] in light of [the Supreme Court case.]"), *aff'd,*
854 F.3d 197 (2d Cir. 2017).

District courts in the Second Circuit have found *Palomar-Santiago* did not
overturn *Sosa* and have continued to apply *Sosa*'s rule, providing an excuse from the
exhaustion of administrative remedies requirement where a waiver of appeal was not
knowingly and intelligently made.[3] This, however, is at odds with *Palomar-Santiago*'s

---

[3] *See, e.g., United States v. Young*, 2023 WL 4054527, at *7 (E.D.N.Y. June 16, 2023) ("[T]he
[c]ourt excuses Defendant from complying with Section 1326(d)(1) because, as explained above,
the IJ misled Defendant into believing that no relief was available by incorrectly telling him that
he was subject to mandatory removal based on his New York state criminal convictions.");
*United States v. Contreras*, 2023 WL 3569274, at *11 n.10 (S.D.N.Y. May 17, 2023) ("'Because
*Palomar-Santiago* did not expressly abrogate *Sosa*,' however, 'this [c]ourt is bound by *Sosa* until

17

instruction that "a court may not excuse a failure to exhaust." *Palomar-Santiago*, 593
U.S. at 326 (internal quotation marks and citation omitted). *United States v. Mejia*, No.
24-3086, and *United States v. Gutierrez-Campos*, No. 25-1695, which held that *Palomar-
Santiago* did not overrule *Sosa*,[4] are on appeal and pending before the Second Circuit.

---

such time that it is revisited by the Second Circuit or the Supreme Court.'") (alteration adopted)
(citations omitted); *United States v. Guzman*, 2022 WL 17068800, at *6 & n.1 (S.D.N.Y. Nov.
17, 2022) (finding "[t]he government's argument that . . . *Palomar-Santiago* . . . abrogated . . .
*Sosa* is unpersuasive[]" and "because *Palomar-Santiago* did not expressly abrogate *Sosa*, this
[c]ourt is bound by *Sosa* until such time that it is revisited by the Second Circuit or the Supreme
Court. It is not the job of a district court to overrule decisions by its court of appeals[]") (internal
citation omitted); *see also United States v. Castro-Aleman*, 141 F.4th 576, 580 n.2 (4th Cir.
2025) (rejecting an argument that "*Palomar-Santiago* has foreclosed the option for an alien to
excuse their failure to administratively exhaust under § 1326(d) in all cases[]" and finding
*Palomar-Santiago* only foreclosed excusing exhaustion where a noncitizen is challenging "the
'substantive validity' of [a] removal order[]") (emphasis omitted), *cert. denied*, 2026 WL 79602
(U.S. Jan. 12, 2026).

[4] In *United States v. Gutierrez-Campos* ("*Gutierrez-Campos I*"), 2022 WL 281582 (S.D.N.Y.
Jan. 31, 2022), *vacated and remanded*, 2024 WL 3856920 (2d Cir. Aug. 16, 2024), the court held
that *Sosa* was still good law, reasoning:

> [T]he Second Circuit in *Sosa* and related decisions in the section 212(c) context
> recognized that while the requirements under section 1326(d) are mandatory as a
> statutory matter, the statutory exhaustion requirement may be excused as a
> constitutional matter where the noncitizen's waiver of appeal was not knowing
> and intelligent. Because the Supreme Court's holding in *Palomar-Santiago* was
> limited to statutory construction and did not address the constitutional concerns
> implicated in *Sosa* and other Second Circuit cases, Second Circuit precedent
> excusing the exhaustion requirement under section 1326(d)(1) where the waiver
> was not knowing and intelligent remains good law.

*Id.* at *19.

On appeal, the Second Circuit vacated and remanded *Gutierrez-Campos I*, finding that the
district court erred in failing to consider whether the noncitizen "had 'available' remedies to
exhaust before . . . excus[ing] him from exhausting those remedies." *United States v. Gutierrez-
Campos*, 2024 WL 3856920, at *2 (2d Cir. Aug. 16, 2024) (alteration adopted). In so deciding,
the Second Circuit clarified, "We express no view about the district court's interpretation of
*Sosa*. Instead, we remand for the district court to revisit its statutory analysis." *Id.*

On remand, the district court again determined that the noncitizen was excused from exhausting
his administrative remedies under *Sosa* "because his waiver of his right to appeal the IJ's
removal order was not knowing or intelligent." *United States v. Gutierrez-Campos* ("*Gutierrez-
Campos II*"), 2025 WL 1368819, at *7 (S.D.N.Y. May 9, 2025). In doing so, the court explained:

The court need not decide this issue because Mr. Sow cannot demonstrate that he was "improperly deprived . . . of the opportunity for judicial review[]" nor can he establish that "the entry of the [Voluntary Departure Order] was fundamentally unfair." 8 U.S.C. § 1326(d)(2)-(3).

### b.    *Sosa*'s Application.

Mr. Sow claims that his self-represented status and the IJ's failure to adequately inform him of the full panoply of his administrative remedies "supports a finding of an invalid waiver." (Doc. 22 at 17) (citations omitted). In *Sosa*, the Second Circuit found that the self-represented noncitizen's waiver of the right to administrative appeal was not knowing and intelligent because he "was not informed of his right to apply for Section 212(c) relief." *Sosa*, 387 F.3d at 137.

Courts, implementing *Sosa*, have found a noncitizen's waiver of the right to administrative appeal is not knowing and intelligent where the noncitizen is not adequately informed of the consequences of waiving the right to appeal,[5] is not adequately informed of the right to apply for section 212(c) relief,[6] or is not adequately

---

While . . . this result is compelled by *Sosa*—which establishes that Section 1326(d)(1)'s exhaustion requirement may be excused as a constitutional matter when the noncitizen's waiver of appeal was not knowing and intelligent—the [c]ourt again notes the apparent tension between this conclusion and the Supreme Court's decision in *Palomar-Santiago*—which confronted Section 1326(d) as a matter of statutory construction—as well as the possibility of incongruous results.

*Id.* at *7 n.5. *Gutierrez-Campos II* is now on appeal.

[5] *See, e.g., United States v. Benitez-Dominguez*, 440 F. Supp. 3d 202, 207 (E.D.N.Y. 2020) ("The IJ did not . . . make clear to [noncitizen] that by waiving his right to appeal he would be consenting to final judgment and would be unable to change his mind at a later date."); *United States v. Ramos de la Rosa*, 2021 WL 2784610, at *3 (S.D.N.Y. July 1, 2021) (finding noncitizen's waiver was not knowing or intelligent because the IJ did not "explain[] the consequences of [noncitizen]'s waiver[]").

[6] *See, e.g., United States v. Calderon*, 391 F.3d 370, 375 (2d Cir. 2004) (finding noncitizen's waiver was not knowing and intelligent because "[n]ot only was [noncitizen] not informed that he had an opportunity to apply for section 212(c) relief, he was explicitly told by the IJ and his counsel that he was barred from doing so[]"); *United States v. Sosa*, 387 F.3d 131, 137 (2d Cir. 2004) (finding noncitizen's waiver was not knowing and intelligent because "[noncitizen] was not informed of his right to apply for Section 212(c) relief[]"); *United States v. Najera-Trejo*, 2006 WL 2191349, at *5 (E.D.N.Y. July 31, 2006) (finding noncitizen's waiver was not

informed of eligibility for voluntary departure.[7] "[A] waiver is not voluntary, knowing, and intelligent when the IJ fails to explain to the defendant the consequences of the waiver or, where a defendant has a clearly established right to be informed about possible routes for challenging deportation, when the IJ fails to state the grounds for appeal the defendant might have." *United States v. Ramos de la Rosa*, 2021 WL 2784610, at *2 (S.D.N.Y. July 1, 2021).

Mr. Sow argues that the IJ's explanation of voluntary departure was misleading because he "did not tell Mr. Sow that even if his failure to depart was not voluntary, that he would then be deported and instead suggested that deportation would only occur if [Mr. Sow] 'refused' to leave." (Doc. 22 at 17) (alteration adopted). This claim is belied by the record. The IJ unequivocally advised Mr. Sow that his failure to leave by August 29, 2024 would result in the conversion of the Voluntary Departure Order to an order of removal: "[Y]ou have to leave the country by August 2[9], 2024. Now if you don't leave, the [c]ourt orders a removal order against you automatically. So you've got to leave." (Doc. 22-5 at 14:6-9.) The IJ repeatedly clarified that Mr. Sow had to "leave by the 2[9]th." *Id.* at 15:25. The IJ did not assert or imply that Mr. Sow's Voluntary Departure Order would be converted into a removal order only if Mr. Sow "refused" to leave.

The IJ also informed Mr. Sow, "you [have] to cooperate with the government immigration officials and . . . supply . . . your travel document." *Id.* at 15:6-8. This point was made clear in several different ways. *See id.* at 12:24-25 ("So you have to have a travel document."). To the extent Mr. Sow believed DHS would obtain his passport, that claim is contradicted by his efforts to procure it from his mother/sister.

---

knowing and intelligent because "the record clearly shows that the IJ erroneously informed [noncitizen] and his counsel that he was ineligible for relief under § 212(c)[]").

[7] *See, e.g., United States v. Brown*, 354 F. Supp. 3d 362, 374 (S.D.N.Y. 2018) ("[Noncitizen]'s failure to exhaust administrative remedies is excused because his waiver of his right to an administrative appeal was not knowing and intelligent due to the IJ's erroneous instruction that he was ineligible for voluntary departure."); *United States v. Guzman*, 2022 WL 17068800, at *6 (S.D.N.Y. Nov. 17, 2022) ("[IJ]'s misleading statement that led [noncitizen] to believe he was not eligible for voluntary departure rendered [noncitizen]'s waiver of his right to appeal not knowing and intelligent.").

Moreover, even if the IJ failed to fully describe the procedures governing voluntary departure during the July 30, 2024 Hearing, Mr. Sow does not point to any caselaw, regulation, or statute providing him with a right to be fully apprised of the rules governing voluntary departure or the right to appeal once he expressed a desire for voluntary departure. *See United States v. Taveras*, 504 F. Supp. 3d 272, 287-88 (S.D.N.Y. 2020) (rejecting noncitizen's argument that "a waiver is not knowing and intelligent where the IJ does not affirmatively alert the alien to a potentially meritorious appellate claim[]" because "[t]here is . . . no analogous 'established right to be informed of the possibility' that an NTA was deficient or that a post-hearing challenge to jurisdiction might be viable.' [Noncitizen] does not cite any authority obliging an IJ to notify him of this possibility, or to issue-spot potential post-hearing collateral challenges[]"). Indeed, at the January 29, 2026 Hearing, Mr. Sow's counsel, Assistant Federal Public Defender ("AFPD") Emily Kenyon, conceded that, although the IJ made omissions and might not have given a full explanation of voluntary departure, the IJ's explanation was not incorrect. AFPD Kenyon acknowledged that, were this court to find the lack of a more fulsome description was fundamentally unfair, this would be a case of first impression.

While a noncitizen's self-represented status weighs in favor of finding a waiver was not knowing and intelligent, *see Calderon*, 391 F.3d at 375, correspondingly, it does not automatically render a waiver invalid. *See Taveras*, 504 F. Supp. 3d at 287 ("That [noncitizen] was *pro se* does not make his waiver other than knowing or intelligent."). Mr. Sow does not present facts demonstrating that his self-represented status precluded him from knowingly and intelligently waiving his right to an administrative appeal. He was informed of the right to be represented by an attorney at no cost and chose not to do so. The IJ advised him: "[Voluntary departure] is a final resolution to your case. So there's no appeal. So you're . . . accepting this as a final resolution[]" to which Mr. Sow responded in the affirmative: "Okay." (Doc. 22-5 at 12:1-4.)

Moreover, Mr. Sow had previous experience in courtroom settings in light of his criminal history, and he was in contact with an attorney prior to his July 30, 2024

21

Hearing. He nonetheless clearly expressed a desire to forego representation and opt for voluntary departure as opposed to pursuing an appeal. His waiver of appeal was thus knowing and intelligent.

For the reasons stated above, the court does not excuse Mr. Sow's failure to exhaust his administrative remedies.

## C.    Whether Mr. Sow Was Deprived of the Opportunity for Judicial Review.

To satisfy the second requirement of § 1326(d)(2), a noncitizen must establish that "the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review[.]" 8 U.S.C. § 1326(d)(2). Mr. Sow argues that "by statute, no judicial review [was] available [to him][,]" and alternatively, "[e]ven if a chance for judicial review 'technically existed' that does not 'necessarily mean' that [he] had an opportunity for judicial review." (Doc. 22 at 17.) The government counters that Mr. Sow had an opportunity for judicial review because he could have filed a motion to reopen or reconsider but "made the strategic decision not to file such a motion 'because it would have terminated the grant of voluntary departure.'" (Doc. 31 at 9) (citation omitted). Mr. Sow responds that "[t]he filing of a motion to reopen or reconsider is properly considered as an administrative remedy, rather than judicial review, as the motion would have been filed with the [IJ]." (Doc. 39 at 4 n.2.)

As the Supreme Court has observed, in removal proceedings, "the alien may file a motion to reconsider, a motion to reopen, an appeal to the BIA, and a petition for review in federal court." *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (citations omitted). Although Mr. Sow's motion to reopen or reconsider would have initially been filed with the IJ and would have terminated his grant of voluntary departure, it is nonetheless considered an opportunity for judicial review. *See United States v. Outram*, 445 F. App'x 509, 517 (3d Cir. 2011) (finding noncitizen was not deprived of the opportunity for judicial review because he failed "to appeal the IJ's and BIA's denial of his motion to reopen").

22

Because Mr. Sow did not file a motion to reopen or reconsider, he was not deprived of the opportunity for judicial review.

### D.    Whether Mr. Sow's Hearing Was Fundamentally Unfair.

"[T]he establishment of a fundamentally unfair hearing in violation of due process requires a showing both of a fundamental procedural error and that the error caused prejudice[.]" *Fernandez-Antonia*, 278 F.3d at 159 (citation omitted). "The alien bears the burden of showing that entry of the removal order was fundamentally unfair." *United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012).

Mr. Sow argues that the following fundamental procedural errors took place in his case:

> First, the voluntary departure order should not have automatically converted to an order of deportation after August 29, 2024 because Mr. Sow did not voluntarily fail to depart. Second, the [IJ] erred when he failed to tell Mr. Sow that any requests to extend the time to voluntarily depart needed to be made to DHS. Third, the utter lack of any procedure to govern the grant of voluntary departure to incarcerated individuals, an incredibly important right, is itself a due process violation.

(Doc. 22 at 9-10.)

### 1.    Mr. Sow's Removal Order.

Under the INA § 240B(d), "if an alien is permitted to depart voluntarily . . . and *voluntarily fails to depart* the United States within the time period specified," the noncitizen is subject to certain penalties. 8 U.S.C. § 1229c(d)(1) (emphasis supplied). In *In re Zmijewska* ("*Zmijewska*"), 24 I. & N. Dec. 87 (BIA 2007), the BIA addressed "the meaning of the phrase 'fails voluntarily to depart the United States' contained in section 240B(d)." *Id.* at 91. In its analysis, the BIA noted that, through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress repealed a provision providing "an 'exceptional circumstances' exception for failing to depart within the allotted time[,]" which had been "defined to include 'exceptional circumstances (such as serious illness of the alien or death of an immediate relative of the alien, but not including less compelling circumstances) beyond the control of the alien.'" *Id.* at 90. The BIA found that, when enacting amendments to the INA in 2006, "Congress also changed

the wording of the introductory clause of section 240B(d) from 'fails voluntarily to depart' to 'voluntarily fails to depart.' This change in wording clarifies that the phrase was not intended to apply to every alien who failed to depart within the voluntary departure period but was meant to limit the penalties to only those aliens whose failure to depart was voluntary." *Id.* at 91. For this reason, the BIA held that, "[u]nder the terms of section 240B(d) of the [INA], a respondent who, through no fault of her own, remains unaware of the grant of voluntary departure until after the period for voluntary departure has expired cannot be said to have 'voluntarily' failed to depart within the period of voluntary departure." *Id.* at 94.

In deciding *Zmijewska*, the BIA distinguished the INA § 240B(d)'s voluntariness exception from the prior exceptional circumstances exception:

> We emphasize that the "voluntariness" exception is not a substitute for the repealed "exceptional circumstances" exception. It is a much narrower exception limited to situations in which an alien, through no fault of his or her own, is unaware of the voluntary departure order *or is physically unable to depart.* It would not include situations in which departure within the period granted would involve exceptional hardships to the alien or close family members. Nor would lack of funds for departure be considered an involuntary failure to depart.

*Id.* (emphasis supplied).

Since the BIA's decision in *Zmijewska*, courts have found that only "a respondent who, through no fault of her own, remains unaware of the grant of voluntary departure until after the period for voluntary departure has expired cannot be said to have 'voluntarily' failed to depart within the period of voluntary departure." *Id.*[8] Mr. Sow

---

[8] *See, e.g., Zhi Pai Liu v. Gonzales*, 247 F. App'x 235, 236 (2d Cir. 2007) (holding the petitioner could not challenge his voluntary departure order because "[u]nlike the petitioner in . . . *Zmijewska*, [noncitizen] has never asserted that he was not informed of the voluntary departure order contained in the IJ's original decision, or of its reinstatement following the BIA's March 2004 decision[]"); *Berdiev v. Garland*, 13 F.4th 1125, 1135 (10th Cir. 2021) (remanding the case because "the BIA's denial of [noncitizen]'s motion to reopen failed to address [noncitizen]'s argument that he was unaware of the departure period and failed to consider whether that would have allowed [noncitizen] to remain eligible for adjustment under *Zmijewska*[]"); *Pedroza v. Holder*, 435 F. App'x 688, 691 (9th Cir. 2011) (remanding the case "to allow the BIA to consider [noncitizen]'s motion to reopen in light of *Zmijewska*[]" because "[noncitizen] alleges

makes no such claim, nor could he. Instead, he relies on *Hillary K. v. DHS-ICE*, 2020
WL 1922570 (D. Minn. Apr. 21, 2020) to argue that the voluntariness exception is
broader than the definition set forth in *Zmijewska*. In *Hillary K.*, the defendant failed to
depart the United States on the required date and, as a result, his voluntary departure
order was converted into a removal order. The defendant filed a motion to halt
deportation and a motion to nullify the voluntary departure order. In order to decide those
motions, the *Hillary K.* court "requested additional briefing from the parties" due to the
following:

> The [c]ourt's concern was that the record was unclear whether [the
> defendant] was in fact under a final order of removal. The alternate order of
> removal entered by the [IJ] took effect only if [the defendant] failed to
> voluntarily depart within the required time frame. An alien has not
> "voluntarily failed to depart" within the meaning of 8 U.S.C. § 1229c(d) if
> the alien, *through no fault of his own*, is physically unable to depart within
> the time granted. [The defendant] had been continuously detained during
> the entire 60 days during which he was permitted to voluntarily depart.
> Thus, it was not clear to the [c]ourt whether the condition to entry of the
> final order of removal had been met.
>
> Based on the government's comprehensive brief and the [c]ourt's own
> research, the [c]ourt is now satisfied that [the defendant] is subject to a final
> order of removal. [The defendant] had an opportunity to voluntarily depart
> to Kenya, but failed to do so within 60 days of the BIA's October 31, 2019
> order. As a result, the alternate order of removal entered by the [IJ] became
> subject to execution on December 31, 2019.

---

that as a result of [his counsel]'s ineffective assistance he never received notice of the BIA's
decision, and was unaware of the voluntary departure deadline[]"); *Valdivias v. Holder*, 453 F.
App'x 685, 686 (9th Cir. 2011) ("[T]he circumstances of this case strongly support Petitioner's
argument that he did not *voluntarily* fail to depart. Although Petitioner was informed of his
obligation to depart the country first by the [IJ] and then by the BIA, the record does not show
that he understood the deadline by which he was required to do so. Nor is that deadline
obvious.") (emphasis in original); *Antonyan v. Holder*, 385 F. App'x 688, 688 (9th Cir. 2010)
("If an alien is aware of her voluntary departure deadline, fails to depart before that deadline, and
then files a motion to reopen, the BIA must deny the motion."); *Liang Yuan Zhu v. Mukasey*, 267
F. App'x 651, 652 (9th Cir. 2008) ("[Noncitizen] concedes that he received notice of the BIA's
order granting him thirty days to voluntarily depart, and therefore, he cannot legitimately claim
that he involuntarily failed to depart.").

*Id.* at *2 (alteration adopted) (emphasis supplied) (internal citations omitted). The government's "comprehensive brief" included a declaration by an ICE officer wherein the officer explained that he attempted to help the defendant obtain a travel document, but the defendant did not cooperate and made no effort to voluntarily depart. *Id.*

Mr. Sow focuses on the declaration in *Hillary K.* because the officer describes ways in which ICE officers may facilitate the process for noncitizens in custody to voluntarily depart the United States. In his case, Mr. Sow alleges that ICE officers did not assist him in obtaining his passport or other travel documentation despite his repeated attempts to voluntarily depart. The record does not support this characterization. Instead, Mr. Sow was advised by the IJ that he was required to furnish his own travel document, he was visited weekly by an ICE agent to assist in his departure, he told that individual he had requested a travel document through a consulate official which apparently proved inaccurate, and he also sought his passport from his mother/sister. Mr. Sow's desire to visit Turkey in order to obtain a repair of his veneers provides a motive for a delay in his voluntary departure. When he was removed, Mr. Sow had no difficulty in directing his sister where to deliver his luggage. Mr. Sow cites no statute, regulation, or other policy requiring ICE officials to secure a noncitizen's passport from family members. To the contrary, 8 C.F.R. § 1240.26(b)(3)(i) requires that "[t]he alien . . . present to DHS, for inspection and photocopying, the alien's passport or other travel documentation sufficient to assure lawful entry into the country to which the alien is departing[.]" Against this backdrop, the court cannot find Mr. Sow has established that it was through no fault of his own that he could not physically depart.

For the foregoing reasons, the court finds the conversion of Mr. Sow's Voluntary Departure Order into a removal order was not a fundamental procedural error in violation of due process.

### 2. The IJ's Failure to Inform Mr. Sow That an Extension of Voluntary Departure Be Directed to DHS.

Mr. Sow argues that the IJ committed a fundamental procedural error because, at the July 30, 2024 Hearing, when he "noted[] the time for voluntary removal can be

extended up to 120 days[,]" he "failed to explain the counterintuitive fact that any request
for an extension had to be made to DHS, rather than to the [IJ] who set the original
deadline." (Doc. 22 at 15) (internal quotation marks omitted). Because the Voluntary
Departure Order advised that DHS grants extensions and there is no evidence that Mr.
Sow sought an extension from the IJ, there was no fundamental procedural error on this
basis.

### 3.    The Procedure Governing Voluntary Departure.

Mr. Sow contends that "the utter lack of any procedure" governing voluntary
departure and the government conditioning "voluntary departure on requiring the
individual to admit he or she is removable and to withdraw any applications for relief[]"
are due process violations. (Doc. 22 at 15.) The government counters that Mr. Sow's due
process arguments fail because "voluntary departure is a privilege, not a right – thus there
can be no due process violation." (Doc. 31 at 14) (citations omitted).

While the Second Circuit "ha[s] long held that voluntary departure is not
something to which an alien is generally entitled as a matter of right[,]" *Cervantes-
Ascencio v. U.S. I.N.S.*, 326 F.3d 83, 86 (2d Cir. 2003), the Supreme Court has "rejected
the wooden distinction between 'rights' and 'privileges' that once seemed to govern the
applicability of procedural due process rights." *Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564, 571 (1972); *see also Graham v. Richardson*, 403 U.S. 365, 374 (1971)
("But this Court now has rejected the concept that constitutional rights turn upon whether
a governmental benefit is characterized as a 'right' or as a 'privilege.'") (citations
omitted); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) ("The constitutional challenge
cannot be answered by an argument that public assistance benefits are a privilege and not
a right.") (internal quotation marks and citation omitted).

"In immigration cases, 'the Due Process Clause requires only that an alien receive
notice and a fair hearing where the [Immigration and Naturalization Service ("INS")]
must prove by clear, unequivocal, and convincing evidence that the alien is subject to
deportation.'" *Cervantes-Ascencio*, 326 F.3d at 86. In this case, Mr. Sow received clear
notice that he was subject to removal, and he also received a hearing before an IJ, the

27

opportunity for voluntary departure, and a written order advising him of the requirements for voluntary departure. The IJ advised him in clear and unequivocal language that he would be subject to deportation if he failed to voluntarily depart by the designated deadline.

To be granted voluntary departure, 8 C.F.R. § 1240.26(b)(1)(i) requires that, among other things, a noncitizen "[m]akes no additional requests for relief (or if such requests have been made, such requests are withdrawn prior to any grant of voluntary departure pursuant to this section)[]" and "[c]oncedes removability[.]" 8 C.F.R. § 1240.26(b)(1)(i)(B)-(C). The Second Circuit has found that 8 C.F.R. § 1240.26(b)(1)(i)'s requirements do not violate due process:

> Nor was Petitioner denied procedural due process when she was required to waive her appeal rights as an eligibility requirement for voluntary departure under 8 C.F.R. § 240.26(b)(1)(i)(A)-(E). Promulgating limits on eligibility for voluntary departure involves broad discretion by the INS, as does granting or denying voluntary departure. This discretionary component not only substantially curtails our review authority, but also precludes entitlement to such relief as a matter of right. Indeed, we have long held that voluntary departure is not something to which an alien is generally entitled as a matter of right. Accordingly, Petitioner's hearing comported with due process requirements. We find no substantial constitutional issue in connection with application of any eligibility requirements for voluntary departure and, therefore, deny Petitioner's due process claim.

*Cervantes-Ascencio*, 326 F.3d at 86-87.

Because Mr. Sow was given notice and an opportunity to be heard, was provided with oral and written instructions by the IJ, and was granted voluntary departure despite not being entitled to it as a matter of right, his due process rights were not violated by the process set forth in 8 C.F.R. § 1240.26(b)(1)(i). There was no fundamental procedural error on this basis.

### 4.    Prejudice.

"Prejudice is shown where 'defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred.'" *Copeland*, 376 F.3d at 73 (citation omitted). Otherwise, "[i]f the alien would have been deported even after a procedurally perfect proceeding, 'he would have stood before the courts just as he does

28

## CONCLUSION

For the aforementioned reasons, the court DENIES Mr. Sow's motion to dismiss. (Doc. 22.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 24th day of February, 2026.

Christina Reiss, Chief Judge
United States District Court